UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

TYRON CAMPBELL,

                                                                Plaintiff,

                -against-

CITY OF NEW YORK, DETECTIVE JOHN MCHUGH
(Shield # 581), UNDERCOVER OFFICER 217,
UNDERCOVER OFFICER 52, and SERGEANT ERIC
FRANCIS (Shield # 1705),

                                                               Defendants.

------------------------------------------------------------------------ x

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

**15-CV-4984 (RRM) (MDG)**

      Plaintiff Tyron Campbell, by his attorney Amy E. Robinson, of Stoll, Glickman & Bellina, LLP, for his Complaint alleges as follows:

## PRELIMINARY STATEMENT

1. This is a civil rights action in which Plaintiff seeks relief through 42 U.S.C. §§ 1983 and 1988 for the violation of his civil rights protected by the Fourth and Fourteenth Amendments, in addition to violations of the laws and Constitution of the State of New York.

2. The claim arises from a July 22, 2014 incident in which Defendants, acting under color of state law, intentionally and willfully subjected Plaintiff to false arrest.

3. Plaintiff seeks monetary damages (special, compensatory, and punitive) against Defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

4. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988 and the laws and Constitution of the State of

New York.

5.     The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a), and the doctrine of pendent jurisdiction.

## VENUE

6.     Venue is laid within the Eastern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claim occurred within the boundaries of the Eastern District.

## PARTIES

7.     Plaintiff TYRON CAMPBELL resided at all times here relevant in Kings County, City and State of New York.

8.     The CITY OF NEW YORK ("City") is a municipal corporation organized under the laws of the State of New York.  At all times relevant hereto, Defendant City, acting through the New York Police Department ("NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline, retention, and conduct of all NYPD personnel.  In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that NYPD personnel obey the laws of the United States and the State of New York.

9.     Defendants DETECTIVE JOHN MCHUGH, UNDERCOVER OFFICER ("UC") 217, UNDERCOVER OFFICER ("UC") 52, and SERGEANT ERIC FRANCIS were, at all times here relevant, police officers of the NYPD, and as such were acting in the capacities of agents, servants, and employees of the City of New York.  On information and belief, at all times relevant hereto, the defendant officers were involved in the decision to arrest Plaintiff without probable cause or failed to intervene in the actions of their fellow officers when they observed

their fellow officers arresting Plaintiff without probable cause. The defendant officers are sued in their individual capacities.

10. At all times here mentioned Defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## NOTICE OF CLAIM

11. Within 90 days of the events giving rise to these claims, Plaintiff filed written Notices of Claim with the New York City Office of the Comptroller. Over 30 days have elapsed since the filing of those Notices, and this matter has not been settled or otherwise disposed of.

## FACTUAL ALLEGATIONS

12. Plaintiff Tyron Campbell lives at 170 Herkimer Street, Brooklyn, New York.

13. Plaintiff's son's maternal grandparents live at 140 Herkimer Street, a few doors down the block.

14. On July 22, 2014, at approximately 4:00 P.M., Plaintiff arrived at 140 Herkimer Street, to pick up his two sons from their grandparents' home.

15. When he arrived at 140 Herkimer, Mr. Campbell greeted a neighbor and the maintenance man for the building, two men he has known for many years. After a short conversation, Mr. Campbell went inside his sons' grandparents' apartment and visited with his mother-in-law.

16. A few minutes later, Mr. Campbell left his mother-in-law's apartment with his youngest son, who was five years old at the time.

17. Shortly thereafter, at approximately 4:20 P.M., an unmarked van pulled up and NYPD police officers got out.

3

18. The officers told Mr. Campbell that they had been watching him for several hours and arrested him.

19. Mr. Campbell explained to the officers that he had not been there for several hours, that he had just arrived in the neighborhood 20 minutes ago, and that he had done nothing illegal.

20. The officers searched Mr. Campbell. They did not recover any drugs, weapons, contraband, or prerecorded buy money on Mr. Campbell or in his vicinity.

21. Mr. Campbell was handcuffed and placed in the backseat of the police van. Defendants Detective McHugh, UC 217, UC 52, and Sergeant Francis were involved in the arrest of Plaintiff, or were present and failed to intervene in the obviously illegal actions of their fellow officers.

22. Mr. Campbell sat in the police van for several hours as the officers drove around Brooklyn, arresting other individuals.

23. Eventually, Plaintiff was taken to the 79th Precinct and then to Brooklyn Central Booking.

24. On the morning of July 23, 2014, Mr. Campbell was arraigned in Brooklyn Criminal Court. He was charged with violations of New York Penal Law ("P.L.") § 220.16(1) – Criminal Possession of a Controlled Substance in the Third Degree, P.L. § 220.39(1) – Criminal Sale of a Controlled Substance in the Third Degree, and P.L. § 220.03 – Criminal Possession of a Controlled Substance in the Seventh Degree.

25. Plaintiff was released on his own recognizance.

26. Mr. Campbell returned to court on July 24, 2014, to fight his case. The case was adjourned until September 23, 2014.

27. Soon thereafter, the Kings County District Attorney's Office, having determined that it

could not prove the case against Mr. Campbell beyond a reasonable doubt, advanced the case to August 14, 2014, in order to move to dismiss and seal the case.

28. On August 14, 2014, all charges against Mr. Campbell were dismissed.

29. At all times during the events described above, the Defendant police officers were engaged in a joint venture and formed an agreement to violate Plaintiff's rights.  The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events.  They failed to intervene in the obviously illegal actions of their fellow officers against Plaintiff.

30. During all of the events above described, Defendants acted maliciously and with intent to injure plaintiff.

## DAMAGES

31. As a direct and proximate result of the acts of Defendants, Plaintiff suffered the following injuries and damages:

   a. Violation of his rights pursuant to the Fourth Amendment of the United States Constitution to be free from an unreasonable search and seizure of their persons;

   b. Violation of his rights pursuant to the Fourteenth Amendment of the United States Constitution to due process;

   c. Violation of his New York State Constitutional rights under Article 1, Section 12 to be free from an unreasonable search and seizure;

   d. Violation of his New York State Constitutional rights under Article 1, Section 6 to due process;

   e. Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, anxiety; and

   f. Loss of liberty.

## **FIRST CAUSE OF ACTION**
FALSE ARREST & MALICIOUS PROSECUTION
42 U.S.C. § 1983

32. The above paragraphs are here incorporated by reference.

33. The officer Defendants wrongfully and illegally arrested, detained, imprisoned, and falsely charged Plaintiff, and deprived him of his liberty.

34. The wrongful, unjustifiable, and unlawful apprehension, arrest, detention, and imprisonment of Plaintiff was carried out without a valid warrant, without Plaintiff's consent, and without probable cause or reasonable suspicion.

35. At all relevant times, Defendants acted forcibly in apprehending, arresting, and imprisoning Plaintiff.

36. All of this occurred without any illegal conduct by Plaintiff.

37. All charges against Plaintiff were dismissed and sealed on August 14, 2014.

38. The Officer Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment as NYPD officers. Said acts by Officer Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said Defendants acted willfully, knowingly and with the specific intent to deprive Plaintiff of his constitutional rights secured by the United States Constitution.

39. As a direct and proximate result of the misconduct and the abuse of authority detailed above, Plaintiff sustained the damages described above.

## **SECOND CAUSE OF ACTION**
MUNICIPAL AND SUPERVISORY LIABILITY
42 U.S.C. § 1983

40. The above paragraphs are here incorporated by reference.

41. The City is liable for the damages suffered by Plaintiff because, after learning of its employees' violations of New Yorkers' constitutional rights, the City has: failed to remedy the wrong; created policies or customs under which unconstitutional practices regularly occur and even thrive; and has been grossly negligent in managing subordinates who cause the unlawful events. The result of the City's inaction is a culture within the NYPD where the same officers, the same units, and the same precincts repeatedly and routinely engage in acts of misconduct. By failing to properly train, supervise, and discipline its employees, agents, and servants, the City effectively encourages illegal, immoral, and unprofessional behavior.

42. The City has been aware for some time – from civil rights lawsuits, Notices of Claim, complaints filed with the Civilian Complaint Review Board ("CCRB"), City Council hearings, newspaper reports, criminal cases resulting in declined prosecutions and dismissals, and judicial rulings suppressing evidence and finding officers incredible as a matter of law – that a disturbing number of NYPD officers unlawfully search and seize New Yorkers without probable cause, bring charges against New Yorkers with no legal basis, perjure themselves in charging instruments and through testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers.

43. Despite having acquired such knowledge, the City has refused to appropriately sanction its employees' illegal behavior.

44. The City's deliberate indifference to civil rights violations committed by individual police officers, as well as patterns of misconduct committed by the same officers or occurring in the same precinct has caused the constitutional violations against Plaintiff in this case.

**THE CITY FAILS TO TRACK CIVIL RIGHTS LAWSUITS, THEREBY SEVERING ANY POTENTIAL DETERRENT VALUE**

45. For decades, the City has been on notice that certain officers and precincts are

disproportionately responsibility for civil rights lawsuit liability. Nonetheless, the City has failed to take action to hold officers or precincts accountable.

46. In 1999, Comptroller Alan Hevesi, in a memo to Police Commissioner Howard Safir, stated that there was "a total disconnect" between the settlements of civil claims – even substantial ones – and NYPD discipline of officers.[1] Hevesi continued:

> As a result, the NYPD does not learn of potential problem officers, fails to take curative action, and not infrequently fosters a situation in which an officer will engage in another act of violation, resulting in harm to another person and further damages from the City. More important, study of a large number of cases might well reveal patterns of misconduct against which the NYPD could and should take systematic management action.[2]

47. The Comptroller recommended that the police department "analyze . . . settled claims, and take steps to review the officers' performance and propensity to commit acts of excessive force."[3]

48. The City has not heeded Hevesi's advice, and the "total disconnect" remains fully in place today. The number of claims against the NYPD has doubled in recent years, costing taxpayers more than $1 billion.[4]

---

[1] *Id*.

[2] *Id*.

[3] *Id*.

[4] *See* Barry Paddock, Rocco Parascandola, John Marzulli, & Dareh Gregorian, *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE (reporting that the number of claims against the NYPD doubled between 2004-2014, to a record high of 9,570 lawsuits filed in 2012, costing taxpayers nearly $1 billion); Colleen Long & Jennifer Peltz, Associated Press, *Nearly $1B in NYC police payouts*, Yahoo! News (October 14, 2010, 7:44 PM), http://news.yahoo.com/ap-investigation-nearly-1b-nyc-police-payouts.html (reporting that, in the decade ending in 2010, the City paid out nearly one billion dollars to resolve claims against the NYPD); Caroline Bankoff, *The City Has Paid Almost Half a Billion Dollars in NYPD-Related Settlements Over the Past 5 Years*, NYMag.com, Oct. 12, 2014, http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html (reporting that, between 2009-2014, New York City paid out more nearly $500 million to settle NYPD-related cases); see also City of New York, Office of the Comptroller Claims Report FY 2012, 30, June 4, 2013,

49. Yet the City continues to resist attempts to catalog even the most basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD. Although certain police officers, units, and precincts have been found to have violated New Yorkers' constitutional rights *repeatedly*, the City refuses to track the data, or even to use the data it already has.[5]

50. Courts – including this nation's highest court – assume that civil rights lawsuits deter police misconduct. *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.") (citing *Carey v. Piphus,* 435 U.S. 247, 254-257 (1978)); *Hudson v. Michigan*, 547 U.S. 586, 598 (2006) ("As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts.") (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) and *Nix v. Williams,* 467 U.S. 431, 446, (1984)).

51. However, because the City of New York refuses to track civil rights lawsuits, such suits do not serve the deterrent purpose envisioned by the Supreme Court.

52. Civil rights lawsuits against NYPD officers have no impact on the officers' careers, regardless of the expense to the City to defend a police misconduct case, and even when the same officers are named in multiple lawsuits, because settlements of civil claims are ordinarily

---

https://www.documentcloud.org/documents/1375759-fy-2012-claims-report.html (noting that, in fiscal year 2012, so-called "police action claims," which are claims that result from false arrest or imprisonment, police shootings, excessive use of force, assault, or failure to protect, cost the City $64.4 million, and that in fiscal year 2011, the City paid out $60.2 million in police action claims).

[5] *See, e.g.*, Barry Paddock, et al., *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE ("The [Daily] News' investigation was centered around the results of a Freedom of Information Law request for a list of lawsuits filed against officers who have been sued 10 or more times over the past decade. The city Law Department provided the names of 51 officers and 463 cases. A News search found an additional 146 cases against the officers, and four other officers who should have been included in the response — calling into question the city's ability to track these cases.").

not even noted in an officer's personnel file.[6]

53. By failing to keep track of crucial data – which could save lives as well as taxpayer money – the City has created a system in which lawsuits are severed from any potential deterrent effect.

**THE CITY FAILS TO DISCIPLINE OFFICERS WHO COMMIT PERJURY AND FALSIFY OFFICIAL RECORDS**

54. The City is liable to Plaintiff for its failure to keep track of judicial decisions in suppression hearings where police officers have been found to have fabricated testimony.

55. There are hundreds of published decisions from the past several years in which judges in New York City courtrooms determine that, as a matter of law, police officers have testified incredibly, conducted illegal searches and seizures, and even suborned perjury.

56. Judicial decisions from suppression hearings and trials are particularly reliable indicators of a police officer's professional conduct and credibility because the testimony has been tested in open court, under oath.

57. Yet those in a position of authority – such as NYPD supervisors and prosecutors – have no procedure to notify individual officers or their supervisors of adverse judicial findings.

58. Without any notification, improper search and seizure practices and incredible testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored, and repeated misconduct by individual officers goes unaccounted for.

59. This has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal. As the Honorable Jack Weinstein, United States District Court Judge of the Eastern District of New

---

[6] Association of the Bar of the City of New York, Committee on New York City Affairs, "The Failure of Civil Damages Claims to Modify Police Practices, and Recommendations for Change," March 2000, *available at* http://www2.nycbar.org/Publications/reports/print_report.php?rid=32.

York, has written:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

*Colon v. City of New York*, No. 09-CV-8, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009).

## THE CITY FAILS TO HOLD POLICE OFFICERS FINANCIALLY LIABLE, RESULTING IN A COMPLETE LACK OF ACCOUNTABILITY

60. The City of New York is also liable in this case because, by habitually indemnifying police officers who have acted unconstitutionally, the City isolates such officers from accountability.[7] The effect – yet again – is that civil rights lawsuits do not serve a deterrent purpose. "It is almost axiomatic that the threat of damages has a deterrent effect, *surely particularly so when the individual official faces personal financial liability*." *Carlson v. Green*, 446 U.S. 14, 21, (1980) [emphasis added] (citing *Imbler v. Pachtman*, 424 U.S. 409, 442 (1976)) [footnote omitted].

## THE CITY HAS FAILED TO CREATE A MEANINGFUL POLICE OVERSIGHT AGENCY, THUS ALLOWING OFFICERS' UNLAWFUL BEHAVIOR TO GO UNCHECKED

61. The City is liable because it has created a legal system in which officer misconduct routinely goes unpunished.

---

[7] *See* Eric Jaffe, *When Cops Violate Civil Rights, It's City Taxpayers Who Pay*, CITYLAB, Dec. 4, 2014, http://www.citylab.com/crime/2014/12/when-cops-violate-civil-rights-its-city-taxpayers-who-pay/383419/ (reporting that taxpayers almost always satisfy both compensatory and punitive damages awards entered against police officers).

62. The City has purported to attempt to address police officers' abuse of authority, in part through the creation of the CCRB, a police oversight agency with investigative powers.

63. However, the CCRB has proved vastly inadequate.

64. First, the CCRB fails in its mission because it often has found that complainants "lack credibility" based on the fact that the complainant has also brought a civil rights lawsuit. The result is that the CCRB often fails to substantiate some of the most serious allegations.

65. Second, when the CCRB has determined that officers have made false statements to the CCRB in their own defense, the CCRB virtually never initiates its own findings against those dishonest officers. The same is true in situations where the CCRB finds that officers have failed to report their fellow officers' misconduct.

66. Third, because the CCRB's penalty recommendations are purely advisory and there is no enforcement mechanism, the recommendations have no binding effect on the NYPD or its officers. Even when the CCRB substantiates complaints, the police department rarely imparts its own discipline on the officer, and often simply drops the complaints.[8]

67. Fourth, the NYPD Department Advocate, which is endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized. Furthermore, in the rare event that the CCRB substantiates a complaint and the Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to reduce the discipline against such an officer, a power the commissioner has wielded.

68. The complaint procedure provides seemingly countless opportunities for City agencies

---

[8] *See* Nathan Tempey, *CCRB: Cop Who Shoved Kid Through Hookah Bar Window Used Excessive Force*, gothamist, July 28, 2015, http://gothamist.com/2015/07/28/bronx_hookah_window_ccrb.php (reporting that in 2014, the CCRB substantiated only 327 of nearly 5,000 complaints, and that the NYPD disciplined 10 2 officers in that same period. Of the officers disciplined, only 22 faced administrative charges); WNYC.org, *Police Punishment: CCRB vs NYPD*, http://project.wnyc.org/ccrb/ (last visited July 23, 2015) (reporting that, in 2012, police officers received no discipline in 104 cases (40.3%) of the substantiated complaints processed (258); in 2013, the NYPD dropped 28.3% of the substantiated complaints without any disciplinary action; in 2014, it dropped 24.5%).

to dismiss or disregard legitimate, credible complaints.

69. Due to the failures of the CCRB, many abuses of authority by police officers go unreported. Officers are thus free to abuse their authority with little or no fear of repercussions. Here, the lack of accountability contributed to the defendant police officers' actions described above in that the officer defendants knew they were insulated from any repercussions for their unlawful actions against Plaintiff.

**THE CITY HAS ENCOURAGED UNCONSTITUTIONAL STOPS THROUGH ITS USE OF ARREST QUOTAS**

70. The City has also been alerted to the regular use of "Stop, Question, and Frisk" by its police officers, which disproportionately target people of color, despite the humiliation, inconvenience, and constitutional violations that the majority of law-abiding people, mostly in communities of color, suffer as a result.

71. Even as the use of "Stop, Question, and Frisk" has declined precipitously in recent years – in large part due to the federal class action lawsuit *Floyd, et al. v. City of New York, et al.*, 08-CV-1034 (SAS) – the police have continued to use the policing tactic in a severely racially disproportionate manner, and for the improper purpose of meeting "performance goals" (more commonly known as arrest quotas).

72. According to data collected by the New York Civil Liberties Union ("NYCLU"), in 2014, New Yorkers were stopped by the police 46,235 times. Of the people stopped: 38,051 were totally innocent of any crime (82%); 24,777 were Black (55%); 12,662 were Latino (29%); and 5,536 were white (12%).[9]

73. The City is also aware that the misconduct does not stop at the regular use of stop and

---

[9] *See* NYCLU, *Stop and Frisk Campaign: About the Issue*, http://www.nyclu.org/content/stop-and-frisk-data (last visited July 22, 2015).

frisks to violate the civil rights of innocent people. For example, the NYCLU reported that more than 85% of summonses for Open Container were given to Black and Latino New Yorkers, whereas white recipients made up merely 4%.[10] The grossly disproportionate issuance of summonses to New Yorkers of color led one Kings County judge to note that he could not recall ever having arraigned a white defendant on an open container charge.[11]

74. Police officers have repeatedly told New York City news investigations that their supervisors pressure them into reaching "performance goals," resulting in the violation of innocent New Yorker's civil rights.[12]

75. The City's inability to prevent its officers from abusing the stop and frisk policy is emblematic of the City's continuing failures to exercise adequate control over the NYPD, and to prevent police officers from abusing their authority. Such failures have led to further abuse of authority by police officers, including the incident underlying Plaintiff's Complaint.

**DEFENDANT OFFICERS' PRIOR LAWSUIT HISTORY**

76. The City of New York knew or should have known of the defendant officers' propensity to engage in misconduct of the type alleged in this Complaint, specifically arresting New Yorkers without probable cause to believe they have committed a crime or engaged in any wrongdoing.

77. Specifically, the City of New York has been aware of numerous claims of constitutional violations involving Defendant Officer John McHugh, as documented in the

---

[10] See NYCLU, *Testimony Before City Council Public Safety & Courts and Legal Services Committees On Summons Court Operations and Impact*, http://www.nyclu.org/content/testimony-city-council-public-safety-courts-and-legal-services-committees-summons-court-oper.

[11] *People v. Figueroa*, 36 Misc.3d 605, 608 (Kings Co. 2012).

[12] *See* Jim Hoffer, *NYPD Officer Claims Pressure to Make Arrests*, WABC News ( (Mar. 2, 2010, 10:37 PM), http://7online.com/archive/7305356/ and Jim Hoffer, *Kelly Responds to Our NYPD Quotas,* WABC News (May 25, 2010, 3:31 PM), http://7online.com/archive/7461355/.

14

following civil rights actions filed against the City of New York and Officer McHugh:

    a. *Andrews v. City of New York, et al.*, 14-CV-5039 (MKB) (Officer McHugh alleged to have arrested Plaintiff while he was lawfully sitting on a park bench, committing no crimes; case settled);

    b. *Baerga, et al. v. McHugh, et al.*, 13-CV-02678 (RML) (Officer McHugh alleged to have falsely arrested two people who had committed no crime as they were sitting in a parked car in the parking garage of a movie theater; case settled);

    c. *Griffin v. City of New York, et al.*, 12-CV-03130 (WFK) (RER) (Officer McHugh alleged to have falsely arrested a young man in Brooklyn, even though police did not find any contraband on him and he had committed no crime; case settled);

    d. *Shell v. City of New York, et al.*, 14-CV-0639 (RJD) (RER) (Officer McHugh alleged to have arrested a young woman in her home; case settled).

78. Upon information and belief, the City failed to impose any sanctions or punishment on Defendants as a result of these prior lawsuits, resulting in a total lack of accountability and instilling a belief in Defendants that there are no consequences for violating the civil rights of the people they are supposed to protect. That belief contributed to Defendant's conduct towards Plaintiff in the instant case.

79. The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights. Despite such notice, the City has failed to take corrective action. This failure and these policies caused the officers in the present case to violate Plaintiff's civil rights, without fear of reprisal.

80. Plaintiff has been damaged as a result of the City's deliberate indifference.

### THIRD CAUSE OF ACTION
FALSE ARREST & FALSE IMPRISONMENT

81. The above paragraphs are here incorporated by reference.

82. Defendants, their officers, agents, servants and employees, subjected Plaintiff to false

15

arrest, false imprisonment, and deprivation of liberty without probable cause.

83. Defendants intended to confine Plaintiff, Plaintiff was conscious of his confinement, and did not consent to his confinement.

84. All charges against Plaintiff were dismissed.

85. As a direct and proximate result of the misconduct and the abuse of authority detailed above, Plaintiff sustained the damages described above.

## FOURTH CAUSE OF ACTION
### MALICIOUS PROSECUTION

86. The preceding paragraphs are here incorporated by reference.

87. Defendants, acting with malice, initiated a prosecution against plaintiff and caused him to be prosecuted.

88. Defendants did not have probable cause to initiate proceeding.

89. The criminal proceedings were terminated in Plaintiff's favor when the case was dismissed on the District Attorney's motion on August 14, 2014.

90. Defendants have deprived Plaintiff of his civil, constitutional and statutory rights and have conspired to deprive him of such rights and are liable to Plaintiff under 42 U.S.C. § 1983, New York State common law, and the New York State Constitution.

91. As a result of the malicious prosecution implemented by Defendants, Plaintiff was damaged.

## FIFTH CAUSE OF ACTION
### NEGLIGENT HIRING & RETENTION

92. The above paragraphs are here incorporated by reference.

93. Upon information and belief, Defendant City, through the NYPD, owed a duty of care to Plaintiff to prevent the physical and mental abuse sustained by Plaintiff.

16

94. Defendant City, through the NYPD, owed a duty of care, to Plaintiff because under the same or similar circumstances a reasonable, prudent and careful person should have anticipated an injury to Plaintiff or those in a position similar to Plaintiff's as a result of this conduct.

95. Defendant officers were incompetent and unfit for their positions.

96. Defendant City knew or should have known through exercise of reasonable diligence that the officer Defendants were potentially dangerous.

97. Defendant City's negligence in hiring and retaining the officer defendants proximately caused Plaintiff's injuries.

98. Because of the Defendant City's negligent hiring and retention of Defendant officers, Plaintiff incurred damages described above.

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, as follows:

A. In favor of Plaintiff in an amount to be determined by a jury for each of Plaintiff's causes of action;

B. Awarding Plaintiff punitive damages in an amount to be determined by a jury;

C. Awarding Plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D. Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:       February 19, 2016
                   Brooklyn, New York

Respectfully yours,

*[signature]*

Amy E. Robinson, Esq.
Stoll, Glickman & Bellina, LLP
475 Atlantic Avenue, 3rd Floor
Brooklyn, NY 11217
(718) 852-3710
(718) 852-3586
arobinson@stollglickman.com
*Attorneys for Plaintiff*

TO:    New York City Law Department
        Attn: ACC Melanie Speight
        100 Church Street
        New York, NY 10007

        Detective John McHugh, # 581
        Narcotics Borough Brooklyn North
        c/o ACC Melanie Speight
        New York City Law Department
        100 Church Street, 3-312
        New York, NY 10007

        Undercover Officer 217
        Undercover Officer 52
        Sergeant Eric Francis
        Narcotics Borough Brooklyn North
        One Police Plaza, 1100
        New York, NY 10038